**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**July 16, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

_____

CHARLA WHITE, f/k/a Charla Long, as
the Special Administratrix of the Estate of
Perrish Ni-Cole White,

     Plaintiff - Appellant,

v.

BRET BOWLING, in his official capacity
as Creek County Sheriff; TURN KEY
HEALTH CLINICS, LLC,

     Defendants - Appellees.

No. 25-5084
(D.C. No. 4:22-CV-00139-CVE-SH)
(N.D. Okla.)

_____

### ORDER AND JUDGMENT[*]
_____

Before **BACHARACH**, **KELLY**, and **EID**, Circuit Judges.
_____

On July 30, 2021, Perrish Ni-Cole White died at the Oklahoma State

University Medical Center (OSUMC).  After White's death, the special

administratrix of his estate, plaintiff Charla White, brought this action against

defendants associated with the Creek County Jail (CCJ), where White had been

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

incarcerated until eleven days before his death.[1]  She alleged the defendants had been deliberately indifferent to White's serious medical needs in violation of the Eighth and Fourteenth Amendments.  Plaintiff later voluntarily dismissed the defendants sued individually in her complaint.  The district court then granted summary judgment to the remaining defendants:  the Creek County Sheriff in his official capacity and CCJ's medical provider, Turn Key Health Clinics, LLC.  Plaintiff now appeals the grant of summary judgment against the sheriff and Turn Key.  We affirm.

## BACKGROUND

### 1.   White's Medical Care at CCJ

White was booked into CCJ on June 1, 2021, during the COVID-19 pandemic.[2]  CCJ staff completed a medical intake form that included his reported medical history of asthma.  White had been diagnosed with bronchitis and asthma as a child, but he was not currently taking medication for either condition.

Turn Key staff also completed a coronavirus screening form as part of the intake process.  White had not received a COVID-19 vaccination prior to his incarceration.  The record does not indicate whether he would have consented to vaccination had CCJ offered it during his incarceration.  In any event, Turn Key could not request COVID-19 vaccines from the county health department until a sufficient number of inmates consented to vaccination, and CCJ never reached a

---

[1] Throughout this order and judgment we refer to the decedent as "White" and to his special administratrix as "plaintiff" or "Charla."

[2] According to the sheriff, White was booked into CCJ to await transfer to the Oklahoma Department of Corrections after being found guilty of criminal charges.

sufficient level of consenting inmates to receive the vaccine. Plaintiff asserts that the sheriff violated his own COVID-19 policies by clearing him from quarantine prior to the recommended 14-day period and by allowing new inmates into his pod who had not been quarantined.

On July 12, 2021, White complained to detention staff that he had a headache. Staff took him to the medical office, and he waited approximately 30 to 40 minutes without being seen. In a phone call with plaintiff later that day, White complained that a nurse had ordered a detention officer to return him to his unit even though he had not received any medical attention.

The next day, Charla left a voice message for the jail's medical office stating that White had been sick for several days, his head felt like it was about to explode, and he could not operate the jail's medical kiosk system. She also left a message with the jail administrator stating White had been sick for several days and had not been provided medical attention. She described his symptoms and stated he was undergoing a medical emergency and needed medical treatment and/or COVID testing. CCJ's medical staff claimed they never received the messages or checked the medical office voicemail. Plaintiff also called CCJ again that evening, reporting that she had been told White was throwing up blood and again describing his symptoms.

Approximately a half hour after Charla's call that evening, a detention officer transported White to the medical unit where an LPN, Taylor O'Connor, evaluated him. White reported that he was "just super sick." Aplt. App., vol. VI at 1672.

3

O'Connor noted that he had a history of asthma and sinus infections and checked a box indicating he suffered from chronic obstructive pulmonary disease (COPD). She observed that he had a fever, red and itchy eyes, a stuffy nose, a productive cough, that his lungs had "[c]rackles" and were "[d]iminished," that his neck gland was "tender to palpitation" and that he had drainage coming from his ears. *Id.* at 1672-73. His oxygen saturation was 98%.

Selecting Turn Key's predetermined treatment protocol for "upper respiratory congestion" (common cold), O'Connor ordered that White be given Zyrtec, guaifenesin, and acetaminophen for his pain and elevated temperature. *Id.* at 1673–74. Her notes further indicated that the higher-level medical provider (a physician or advanced practice registered nurse (APRN)) should be notified if White showed symptoms of a secondary bacterial infection, had green or yellow purulent sputum or drainage from his nose, ear pain, or dyspnea.

The protocols for treatment of inmates were developed by William Cooper, M.D., Turn Key's chief medical officer. Given White's symptoms, O'Connor could have selected a protocol for COVID-19, but instead she used the upper respiratory congestion protocol. Dr. Cooper acknowledged that selecting the wrong protocol could affect a patient's outcome.

Based on her evaluation, O'Connor determined that White did not meet the criteria for transfer to a hospital. Nor did she refer him to a provider for further evaluation or administer a COVID-19 test. She testified that, based on his symptoms, she did not believe she needed to contact a higher-level medical provider.

4

CCJ's higher-level medical provider, APRN Josephine Otoo, testified that, based on White's symptoms on July 13, O'Connor should have contacted her to evaluate White. Had she been notified, she would have administered a COVID-19 test. Given White's symptoms, she would also have sent him to the hospital even if the test result had been negative. Plaintiff's medical expert, Dr. Wilcox, expressed a similar view about the appropriate course of action given White's symptoms on July 13. He opined that O'Connor was acting outside her scope of practice as an LPN and practicing medicine without a license when she saw White on that date.

Turn Key contends that White did not ask to be seen by medical staff following his evaluation on July 13 until he requested additional medication on July 17. For her part, plaintiff cites a telephone call on July 15 where White told plaintiff about his continued symptoms and related that he had told jail and medical staff that he was sick, but they acted like they didn't hear him.

On July 17, a detention officer walked White to the medical unit to receive an evaluation. According to Amity Williams, the nurse who assessed White on July 17, he complained of sore throat, body aches, and drenching sweats that had continued for five days. He did not complain about shortness of breath, and Williams asserted that she administered flu and COVID-19 tests to White, both of which were negative.[3] She testified that she took White's temperature and oxygen saturation and,

---

[3] Citing irregularities in Williams' entries in White's medical record, plaintiff argued that Williams did not actually evaluate White on July 17 and did not administer flu and COVID-19 tests to him on that date. Williams admitted she initially recorded the information in the wrong patient's medical chart, and she did

although she did not write them down, her normal practice would have been to call the provider if he had an oxygen saturation of less than 90 or a temperature above 100.4 degrees.

White continued to receive over-the-counter medication on July 18 and 19. On July 19 at approximately 4:00 p.m., jail staff notified Williams that White was suffering from chest pain, shortness of breath, and dizziness, and that he was having difficulty walking. He was transported to the medical unit in a wheelchair. Williams noted that White appeared to be weak and was complaining of shortness of breath and dizziness. She took his vital signs and found that he had a low level of oxygen saturation.[4]

Williams contacted an APRN about White's condition. The APRN ordered that White be transported to a hospital. He was then transported to OSUMC.

### 2. White's Medical Care at OSUMC

White was taken to OSUMC's emergency room. He initially tested negative for COVID-19. Given his symptoms, the attending physician ordered a second

---

not realize her mistake until July 30, 2021, when she made a back-dated entry in White's chart. The district court characterized this issue as one of witness credibility that could not appropriately be resolved on summary judgment. But for purposes of the defendant's motions, it assumed that White did *not* receive flu or COVID-19 tests on July 17. Citing other evidence, however, the district court concluded it was sufficiently established that Williams did evaluate White on that date.

[4] Williams did not enter this information contemporaneously into White's medical records. She admits she did not record these events in White's medical records until July 30, 2021.

COVID-19 test, which was positive.  The attending physician determined that White should be hospitalized.

White was given a steroid, intravenous fluids, albuterol, acetaminophen, and supplemental oxygen.  His blood-oxygen saturation improved.  But after he was taken off supplemental oxygen he relapsed into a state of respiratory distress.  He was diagnosed with respiratory failure, COVID-19, and acute kidney injury.

Initially, White's condition stabilized.  By July 20, 2021, he was sitting up in bed and eating.  Although he continued to have coarse breathing sounds, his air was moving well, and he was not wheezing.  White denied suffering from shortness of breath.  His vital signs were stable.

On the next day, July 21 at 6:49 p.m., however, White began to experience severe chest pain.  Testing showed his troponin level was 2.37, indicating that he could be having a heart attack.  A staff physician ordered an EKG.  The physician attempted to contact OSUMC's cardiology department, but the telephone operator could not provide a contact number for the on-call cardiologist.

Several hours later, at 12:13 a.m. on July 22, White's troponin level had increased to 5.66.  The attending physician tried again to contact a cardiologist.  This time he got through.  The on-call cardiologist agreed that the EKG results were "very concerning for a STEMI (ST Elevation Myocardial Infarction)," i.e., a heart attack.  Aplt. App., vol. VIII at 2080 (internal quotation marks omitted).

The cardiologist did not arrive to examine White until 3:51 a.m.  White was taken to the catheterization lab at 4:38 a.m., where it was found that his right

7

coronary artery was 80 percent occluded and his left ventricle was severely inhibited. Turn Key's medical expert, Dr. Brownback, opined that the acceptable time frame for medical intervention and stent placement from detection of a STEMI is 90 minutes. But OSUMC had delayed several hours before beginning appropriate medical intervention.

Three days later, on July 25, testing showed White had an elevated white blood cell count. A chest CT exam indicated he might have bacterial pneumonia. A sputum culture also indicated the presence of harmful bacteria. OSUMC did not begin treating him with antibiotics until three days later, on July 28, 2021, after additional testing conclusively revealed the presence of methicillin resistant staph aureus (commonly known as MRSA). Dr. Brownback noted that White's respiratory problems worsened between July 25 and July 28, and that he was developing sepsis due to the delay in treating his staph infection with antibiotics.

While OSUMC awaited the results of White's bacterial cultures, he was transferred to the intensive care unit to receive a higher level of care due to his chest pain, tachypnea (rapid breathing), and worsening hypoxia. OSUMC staff attempted to insert three catheters into White's body, with mixed success. First, they incorrectly placed a hemodialysis catheter into his carotid artery instead of his jugular vein. They then attempted to place a second catheter into his right femoral vein. This catheter caused a hematoma to develop in his right groin area. They then successfully placed a third catheter in his left groin area. Although OSUMC medical staff determined that the catheter that had improperly been placed in White's carotid

8

artery needed to be surgically removed to decrease the risk of stroke, his worsening condition made him a poor surgical candidate. His medical records do not show that the catheter was surgically removed.

White's blood pressure and kidney function worsened. More extreme measures were undertaken to stabilize him. He died on July 30, 2021. The medical examiner's report listed COVID-19, cardiovascular disease, and obesity as contributing factors in his death, but White's official cause of death was identified as COVID-19.

### 3.  Procedural History

Plaintiff filed this action in state court, alleging claims under Oklahoma's wrongful death statute, the Rehabilitation Act, and 42 U.S.C. § 1983. The defendants removed the case to federal court. Plaintiff then filed an amended complaint asserting only § 1983 claims against the sheriff, Turn Key, and three individual detention officers at CCJ. All defendants moved for summary judgment. Plaintiff voluntarily dismissed her claims against the individual detention officers, and the district court granted summary judgment to the sheriff and Turn Key.

### DISCUSSION

We review the grant of summary judgment de novo, applying the same legal standard used by the district court. *Est. of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1261 (10th Cir. 2022). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary

judgment has the initial burden of identifying for the trial court the absence of genuine issues of fact, but once this burden is satisfied, summary judgment is mandated if the nonmovant fails to come forward with specific evidence demonstrating a triable issue of fact as to each essential element of her case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). We may affirm summary judgment "on any basis supported by the record, even though not relied on by the district court." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008) (internal quotation marks omitted).

"Prison officials violate the Constitution when they act with deliberate indifference to an inmate's serious medical needs." *Beauford*, 35 F.4th at 1262 (internal quotation marks omitted). The deliberate-indifference standard contains "both an objective and a subjective component." *Id.* "A medical need is considered sufficiently serious to satisfy the objective prong if the condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hardy v. Rabie*, 147 F.4th 1156, 1164 (10th Cir. 2025) (internal quotation marks omitted). Where the inmate alleges that harm from a delay in eventual medical treatment, "the objective component of harm may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* (internal quotation marks omitted). "Thus, this standard can be satisfied merely by an intermediate injury, such as the pain experienced while waiting for treatment and analgesics." *Id.* (internal quotation marks omitted).

10

To satisfy the subjective component, the plaintiff "must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Id.* at 1163 (brackets and internal quotation marks omitted). A prison medical professional may be held liable either for failing to treat a serious medical condition properly, or for failing in her role as gatekeeper for other medical personnel capable of treating a condition, "if [s]he delays or refuses to fulfill that gatekeeper role." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), plaintiffs may "sue local governing bodies (or their functional equivalents) directly under § 1983 for constitutional violations pursuant to a body's policy, practice, or custom." *Est. of Burgaz v. Bd. of Cnty. Comm'rs*, 30 F.4th 1181, 1189 (10th Cir. 2022). A *Monell* claim generally requires the plaintiff to "allege facts showing: (1) an official policy or custom, (2) causation, and (3) deliberate indifference." *Id.* "[C]aselaw from this and other circuits has extended the *Monell* doctrine to private § 1983 defendants." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (footnote omitted).

For summary judgment purposes, the district court separately analyzed plaintiff's contentions that (1) the defendants were liable for White's death, and (2) their delay in providing treatment caused White intermediate injury, including pain. We will adopt the same framework for our analysis.

**1. Deliberate indifference claim relating to White's death**

11

In the deliberate indifference context, we ask whether delayed treatment "resulted in" the substantial harm the plaintiff has alleged. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). Expert medical testimony is sometimes necessary to establish the required causation; whether such testimony is required depends on the nature and complexity of the medical issues. *See Alberson v. Norris*, 458 F.3d 762, 765-66 (8th Cir. 2006) (affirming summary judgment where plaintiff did not present expert testimony on causation, concluding the cause of prisoner's death from a "sophisticated medical condition," including the issue of "whether any treatment at all could have alleviated his suffering or arrested the progress of the disease" was "not within the realm of lay understanding" (internal quotation marks omitted)). *Cf. McCarthy v. Weinberg*, 753 F.2d 836, 839 (10th Cir. 1985) (noting, in a deliberate indifference case, that "[t]he factual, medical issues involved are complex, requiring the presentation of expert opinion").

The district court reasoned that under the facts presented, there were multiple possible causes for White's death. Plaintiff was therefore required to offer expert medical testimony to establish that the delayed treatment for White's COVID-19, rather than the treatment he received at OSUMC, caused his death.

Plaintiff points to the medical examiner's determination that identified COVID-19 as White's cause of death. But that determination, by itself, is insufficient to avoid summary judgment on the causation issue. A narrow focus on the stated cause of death obscures the real issue: whether the defendants' delayed treatment, including transporting White to the hospital, resulted in his death. We

agree with the district court that, given subsequent events after White arrived at OSUMC, the issue cannot be resolved by simply invoking the cause of death identified on his death certificate. Instead, expert medical testimony was required to permit a lay jury to resolve the causation issue.

Plaintiff argues Dr. Wilcox provided the required testimony. But she simply notes that Dr. Wilcox adopted the medical examiner's cause of death opinion. And that opinion alone, even if endorsed by plaintiff's expert witness, would not permit a jury to determine whether the delayed treatment White allegedly received at CCJ caused his death. This is particularly true given the multiple intervening medical failures at OSUMC that defendants' expert Dr. Brownback cited as contributing to White's death.

Plaintiff argues that where there are two possible causes for an injury, either of which is supported by permissible, competing inferences, the question should be submitted to a jury. But if the resolution of the causation issue lies outside the realm of a lay jury's understanding, that general rule must give way to the need for expert medical testimony. Because expert testimony concerning causation was required in this case to establish plaintiff's case, but she failed to point us to any such testimony, we affirm summary judgment on plaintiff's claim that defendants' deliberate indifference resulted in White's death.

### 2. Deliberate indifference claim relating to intermediate injury

As the district court recognized, even if the evidence did not support a claim based on White's death, plaintiff could meet the "substantial harm" requirement by

13

showing White suffered from an intermediate injury such as pain or a worsening of his condition resulting from deliberate indifference. *See Mata*, 427 F.3d at 751 (noting that a delay in medical care may satisfy the objective component of the deliberate indifference standard if the delay resulted in "considerable pain"). Plaintiff identifies numerous deficiencies in the care White received at the CCJ that she claims caused him intermediate injury:

- Failure to provide him with any assessment or care on July 12, when he was taken to the jail's medical office;

- Failure to test him for COVID-19, to contact a physician or mid-level provider, and to send him to the emergency room when an LPN evaluated him on July 13; and

- Failure to recognize on July 17 that the medications prescribed to him were inadequate and to properly evaluate him and send him to a hospital on that date.

### A.  Deliberate indifference by individual caregivers

The district court concluded that, even if plaintiff established that caregivers could have done a better job of caring for White, their negligence did not establish deliberate indifference to his serious medical needs.  We agree.  Although "woefully inadequate" care can be deliberately indifferent, *see Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1141 (10th Cir. 2023), the treatment White received does not establish that CCJ's medical staff consciously disregarded a substantial risk of harm.

14

Beginning July 13, White presented symptoms similar to an upper respiratory infection and he was treated for those symptoms. He was seen again on July 17 and reported ongoing symptoms. Williams' testimony suggests that when examining him on that date she detected neither a high fever nor a significantly low oxygen saturation. She continued his medical treatment regimen. Although plaintiff contends that it should have been "obvious" to Williams that this regimen was "utterly inadequate," Aplt. Opening Br. at 36, she fails to show that Williams' actions, even if negligent, were deliberately indifferent as either a treatment provider or gatekeeper. Two days later, when White's oxygen saturation dropped and it was plain that his condition had significantly worsened, he was promptly transported to a hospital.

Though not woefully inadequate, the treatment provided by CCJ's medical personnel may at least have been negligent. Plaintiff argues White's productive cough, fever, and reported history of COPD should have prompted O'Connor to notify a provider rather than simply treating him for an upper respiratory infection/common cold. And, she argues, the medical personnel at CCJ should have tested White for COVID-19, provided access to higher-level medical personnel, and attempted to have him hospitalized even prior to the manifestation of his acute breathing problems. But their failure to take these steps falls short of showing that CCJ's medical personnel "knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Hardy*, 147 F.4th at 1163 (internal quotation marks omitted). *See also Self*, 439 F.3d at 1234 ("[A]

15

misdiagnosis, even if rising to the level of medical malpractice, is simply insufficient under our case law to satisfy the subjective component of a deliberate indifference claim."). Plaintiff has not shown CCJ medical personnel failed to treat White consistently with their understanding of his symptoms. *See Farmer v. Brennan*, 511 U.S. 825, 838 (1994) ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [Supreme Court precedent] be condemned as the infliction of punishment.").

### B. Systemic deficiencies in care

The district court concluded, based on its ruling that defendants did not violate White's constitutional rights, it was unnecessary to reach the parties' arguments concerning the existence of an official policy or custom to provide constitutionally inadequate healthcare at CCJ. Relying on *Crowson v. Washington County*, 983 F.3d 1166 (10th Cir. 2020) and *Garcia v. Salt Lake County*, 768 F.2d 303 (10th Cir. 1985), plaintiff argues that, even if no individual at CCJ committed a constitutional violation, the defendants can still be held liable under a theory that their policies evinced deliberate indifference to White's serious medical needs.

The *Crowson/Garcia* analysis proceeds on the premise that "[d]eliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia*, 768 F.2d at 308. This theory "does not require that a jury find an individual defendant liable." *Id.* at 310. Even so, the plaintiff must show that "a constitutional violation, not just an

16

unconstitutional policy" harmed the inmate. *Crowson*, 983 F.3d at 1191. Typically, a plaintiff satisfies this requirement by showing "the alleged violation occurred as a result of multiple officials' actions or inactions" pursuant to the municipal policy. *Id.* In other words, "the municipality may not escape liability by acting through twenty hands rather than two." *Id.*

Plaintiff has failed to establish a genuine factual issue concerning whether defendants' employees, either individually or collectively, acted with deliberate indifference to White's serious medical needs. To the extent she argues that White suffered sufficiently serious intermediate harm caused by the lack of clinical supervision and direction from persons who did *not* provide care to White—such as doctors or more qualified providers whom defendants could have employed but did not, resulting from their unconstitutional policies—she has failed to show that these staffing decisions "effectively denied [White] access to adequate medical care." *Garcia*, 768 F.2d at 308. Thus, her *Crowson/Garcia* theory fails.

## CONCLUSION

We affirm the district court's judgment.

Entered for the Court

Allison H. Eid
Circuit Judge

17